STATE of Minnesota, Respondent,

v.

Joseph Donald TURE, Jr., Appellant.

No. C5–82–385.

Supreme Court of Minnesota.

June 29, 1984.

504

C. Paul Jones, State Public Defender, Susan K. Maki, Asst. Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, John MacGibbon, Sherburne County Atty., Elk River, Thomas Heffelfinger, Asst. Hennepin County Atty., Minneapolis, Thomas Van Horn, Asst. Dakota County Atty., Hastings, for respondent.

KELLEY, Justice.

Following conviction, defendant Joseph Donald Ture, Jr. was sentenced to manda-

tory life imprisonment for the first-degree murder of Diane Edwards.[1] In this appeal he claims that certain statements made by him to police officers should have been suppressed on fifth and sixth amendment grounds; that the trial court erred in admitting testimony of a witness who had undergone hypnosis prior to testifying; that the trial judge erred in admitting other-crime evidence; that cumulative trial errors require the granting of a new trial; that the evidence is insufficient to sustain the convictions; that the prosecutor's final argument deprived him of a fair trial; and that the court committed sentencing errors. We affirm the judgment of conviction and the sentence imposed on one first-degree murder conviction and the judgment of conviction of one count of kidnapping. We vacate one judgment of conviction for first-degree murder and one judgment of conviction for kidnapping.

On September 26, 1980, 19-year-old Diane Edwards was abducted while walking home from her waitressing job at a Perkins Restaurant in West St. Paul. Four teen-age girls witnessed her abduction. They saw a station wagon drive west on Moreland Avenue, pull onto the sidewalk and stop by a woman walking there alone. The girls heard the woman scream and observed the driver of the station wagon force the woman into his car through the driver's door. They immediately reported the event to the police. Although they were unable to identify the driver or to precisely describe the make, model or year of the vehicle involved, they did inform the police that the abducted woman wore a Perkins uniform and was driven away in a dark-colored station wagon with wood-grain panels.

Kathy Dahn, who was sitting in her car in a laundromat parking lot on Moreland Avenue, also witnessed the abduction. She noticed a man driving an older, brown, somewhat rusty station wagon jump out of the wagon, pick a woman up over his head and throw her into the car through the driver's door. She also heard the woman screaming. She did not contact the police until she heard a news report of the missing Diane Edwards the next day.

A few minutes prior to the abduction, Tomi Willems had been forced off the road near the intersection of Thompson and Oakdale in West St. Paul by an older model, dark brown station wagon. She had stopped at a stop sign when the station wagon lightly rear-ended her car. When she turned around, the driver of the station wagon was grinning at her. The man then drove alongside her car, hopped out of the station wagon, and attempted to open the locked passenger door of Ms. Willems' car. In an attempt to avoid him, she turned left, but the man pursued her in the station wagon and forced her to stop by driving ahead of her and blocking the road. Thereupon, she began honking her automobile horn. As a car approached her from the rear, the station wagon drove away. This incident happened within minutes before, and only a few blocks away from, the abduction of Diane Edwards. Later, Ms. Willems was unable to positively identify the man but described him as being in his mid-20's, unshaven and with brown hair below ear length.

On October 9, 1980, a hunter discovered Diane Edwards' purse on a side road in rural Sherburne County. A few hours later, police discovered Ms. Edwards' naked body lying face down in a ditch close to where the purse had been found. Ms. Edwards' clothes were lying in a pile next to her. Further search uncovered Ms. Edwards' glasses, but nothing was discovered providing a possible lead to the abductor's identity.

The Ramsey County Medical Examiner concluded that Ms. Edwards had died from

---

**1.** The jury found the defendant guilty of first-degree premeditated murder, criminal sexual conduct in the first degree, and two counts of kidnapping—all with Diane Edwards as the victim. He was only sentenced for first-degree murder committed during the course of criminal sexual conduct in the first degree. He also was convicted for first-degree murder while committing or attempting criminal sexual conduct in the first degree. Minn.Stat. § 609.185(2) (1982).

loss of blood resulting from stab wounds in the chest area. In his opinion the stab wounds had been caused by a single-bladed instrument, such as a buck knife, with a 6-inch long blade. He concluded she had died between 11:30 p.m. on September 26, 1980, and 1 a.m. on September 27, 1980. In addition to the stab wounds, the examiner noted four bruises on the face, one bruise on the right shoulder, and what looked like rope marks on the arms. A sexual assault examination was also conducted on the body. It revealed traces of sperm in the cervical area. Because of decomposition, blood-typing on the sperm sample was inconclusive.

A week later West St. Paul police received information that Joseph Ture had been a suspect in a criminal sexual conduct case in Hopkins. At the time of his arrest on the Hopkins charge, defendant had in his possession a number of names of waitresses in the metropolitan area. Later, West St. Paul police learned that defendant had two outstanding misdemeanor traffic tickets in their city. Hoping to question defendant about the Edwards case, they obtained a warrant for defendant's arrest for these traffic offenses. However, the warrants were never executed because West St. Paul police in the interim were informed by the Minneapolis police department that defendant had been arrested in Minneapolis on October 30, 1980 on charges of attempted rape and kidnapping.[2]

The Dakota County sheriff's department and the West St. Paul police questioned defendant several times over the next 2 months at the Hennepin County jail. Thereafter, any contact by officers from Dakota County or West St. Paul ceased until approximately 3 months later. Subse-quently, as a result of further interrogations in April and May 1981, defendant was charged with first-degree premeditated murder, first-degree murder during a sexual assault, two counts of kidnapping and criminal sexual conduct in the first degree.

1. Defendant first contends that statements made by him to various police officers during the course of the investigation of Diane Edwards' death were obtained in violation of rights guaranteed to him by the fifth and sixth amendments to the United States Constitution.

Both of those amendments guarantee an accused a right to legal counsel. The fifth amendment providing that "[n]o person * * * shall be compelled in any criminal case to be witness against himself"[3] has been interpreted to secure a right to legal counsel during custodial interrogation even before the filing of formal criminal charges. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The sixth amendment provides that "[i]n all criminal prosecutions the accused shall enjoy the right * * * to have the assistance of counsel for his defense."[4] The right to counsel granted by the sixth amendment attaches at the time adversary judicial proceedings are commenced against an accused. *Kirby v. Illinois*, 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972).

To address this issue raised by appellant, we review in some detail the questioning conducted by various police authorities. Before the first interview of defendant at the Hennepin County jail on October 30, 1980, a Dakota County officer asked him whether he had been apprised of his rights by Minneapolis officers who had just fin-

---

**2.** These charges stemmed from an incident which occurred on October 27, 1980 in the area of Lake Street and Pillsbury in Minneapolis. J.M. was walking alone there on that evening when a car pulled up to the sidewalk. The driver, later identified as defendant by J.M., got out of that car and tried to drag J.M. into the car. J.M. was able to escape from the driver by burning his face with her lit cigarette.

**3.** This protection applies to state court proceedings through the 14th amendment. *Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). The Minnesota constitution contains an identical provision. Minn. Const. art. I, § 7.

**4.** This protection likewise applies to state court proceedings through the 14th amendment, *Powell v. Alabama*, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932), and is also guaranteed under Minn. Const. art. I, § 6.

ished questioning him on other criminal charges for which he was being held at the jail. Defendant indicated that he had been read his rights by the Hennepin County authorities and that he understood them. Moreover, he agreed to talk with the Dakota County officers.

Within the next few days, defendant voluntarily consented to take a polygraph test and a psychological stress evaluation. On both occasions he was given his *Miranda* rights. Defendant was interviewed by West St. Paul and Stearns County officers on November 12, 1980, after again being given his *Miranda* rights. On November 25, 1980 and early in December, defendant twice was interviewed by a Dakota County detective in the Hennepin County jail, both times at defendant's request. Finally, on January 13, 1981, again upon defendant's request, a West St. Paul detective again interviewed him. On each of these occasions, defendant made admissions of facts that might later prove to be inculpatory. At each interrogation police officers read defendant his *Miranda* rights, and each time defendant indicated he understood his rights and wanted to talk to the officers. At no time did defendant indicate he wanted an attorney.

At the time of this questioning, the Dakota County police officers were aware that defendant was being represented by a court-appointed Hennepin County public defender on charges brought against him in Hennepin County. On no occasion did the officers notify defendant's Hennepin County public defender that they were questioning the defendant about the Diane Edwards case. However, on several occasions these officers specifically asked defendant if his attorney had any objections to defendant talking with them and, further, if defendant wanted to call his attorney representing him on the Hennepin County charges. Each time the defendant replied in the negative. The questioning of the Dakota County officers was strictly confined to the Diane Edwards case and did not involve the pending Hennepin County cases.

Following the January 13, 1981 interview, no law enforcement officer spoke to defendant about the Edwards case again until 3 months later. During that 3-month interval, defendant was tried and convicted in Hennepin County on two charges of criminal sexual conduct involving two other victims. While still incarcerated in the Hennepin County jail awaiting trial on a third charge, defendant requested to speak with the Hennepin County sheriff. In response, Hennepin County detective Archie Sonenstahl, the on-call detective, on April 29, 1981 talked with defendant for several hours. Although most of the conversation concerned defendant's jail problems, in that session he did admit to knowing Ms. Edwards. He also at that time expressed discontent with the public defender representing him on the Hennepin County charges.

On May 7, 1981, defendant was convicted of a third criminal sexual conduct charge in Hennepin County. The next day he requested to speak with Detective Sonenstahl who finally met with defendant in the Hennepin County jail on May 11, 1981. At that time no *Miranda* rights were given defendant. Sonenstahl did not interrogate him about the Edwards case. At this meeting defendant was lamenting the fact that he faced a long prison incarceration as a result of his three Hennepin County convictions. Defendant then initiated discussion of the Diane Edwards case by asking: "If I was involved and if I cooperated with Dakota County on the Diane Edwards case, do you think they would recommend some treatment for me while I am in Stillwater?" Sonenstahl replied: "I can ask 'em * * *. Why don't you have your attorney ask them?" Defendant indicated he did not want his Hennepin County public defender to contact Dakota County authorities. Sonenstahl then agreed to contact the authorities and "get back to" defendant.

The next evening Detective Sonenstahl met with two officers from the Dakota County sheriff's office, an assistant Dakota County attorney, and an assistant Hennepin County attorney. He was first briefed

on the facts of the Edwards case and then told that Dakota County authorities "would be receptive to his [defendant's] cooperation" but they could make no promises. Sonenstahl then left the meeting to speak with defendant in the jail. There, he informed defendant that Dakota County authorities were "receptive" to his cooperation but that they could "make no promises." Defendant was also told "a lot of it would depend on probably the amount of his cooperation and his need for treatment." After defendant had responded "that sounded okay to him," Detective Sonenstahl read defendant his *Miranda* rights, which defendant acknowledged he understood and after which he was willing to talk. Sonenstahl asked defendant if he wanted his attorney who had been representing him on the Hennepin County charges, or any other attorney, present. Defendant replied that he did not. Thereupon, defendant confessed in detail to having abducted, raped and murdered Diane Edwards on September 26, 1980. Sonenstahl later returned to the jail with West St. Paul detective Batzell, and a re-interview containing the confession was tape-recorded. Before taping, defendant was again informed of his *Miranda* rights, indicated that he understood them, and agreed to waive those rights and talk without the presence of counsel.

We address first defendant's contention that his sixth amendment right to counsel had attached. This right does not attach until the initiation of adversary judicial proceedings against an accused "by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Kirby v. Illinois*, 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972); *see also Brewer v. Williams*, 430 U.S. 387, 401, 97 S.Ct. 1232, 1240, 51 L.Ed.2d 424 (1977). Once the right has attached, interrogation of an accused in the absence of his attorney is improper unless the defendant gives a valid waiver of the right. *Giddings v. State*, 290 N.W.2d 595, 597 (Minn.1980).

Since the interrogations by Dakota County authorities and Detective Sonenstahl were merely investigatory and preceded the bringing of formal charges on the Diane Edwards case, ordinarily defendant's sixth amendment right to the assistance of counsel would not attach. Here, however, during the time of the interrogations defendant was being held in the Hennepin County jail awaiting trial on the three Hennepin County charges. During all the questioning, officers knew that defendant was represented by a Hennepin County public defender in connection with those Hennepin County charges. The various officers did not notify the Hennepin County public defender representing defendant on those charges that they planned to question defendant about the Dakota County Edwards case. Accordingly, that attorney was not present during those interviews. However, on several occasions defendant clearly indicated that he did not want that or any other attorney to represent him in connection with his talks with authorities concerning the Edwards case.

Defendant now urges us to hold that where an accused has been formally charged with one offense in one jurisdiction and is represented by counsel with respect to that offense, police must notify that counsel before questioning defendant about a second offense committed in a different jurisdiction for which defendant has not been formally charged. Failure to do so, he claims, automatically results in deprivation of his sixth amendment right to assistance of counsel and renders statements made by him inadmissible.

Courts of other jurisdictions have considered the time at which an accused's sixth amendment right attaches in situations similar to those existing here. A majority of those courts have held the accused's sixth amendment right does not attach in these circumstances. A West Virginia court has considered what effect should be given the fact that, at the time of his confession, an accused was represented by counsel on an unrelated charge in New Jersey. *State v. Clawson*, 270 S.E.2d 659 (W.Va.1980). While being held in New Jersey and while represented by counsel on

the New Jersey charge, the defendant evinced a willingness to confess to murdering two women in West Virginia. The latter charges were unrelated to the New Jersey charge. West Virginia officials obtained the confession without first notifying the defendant's New Jersey counsel. There, as here, the defendant claimed in the subsequent West Virginia prosecution his sixth amendment right to assistance of counsel had been violated. The West Virginia court rejected these contentions saying:

> [W]here counsel has been obtained on an unrelated charge, this fact has no particular bearing on whether the defendant is willing to waive counsel on the present charge. It cannot be said from either a constitutional or ethical standpoint that because a defendant has counsel on one criminal charge, the State is thereby foreclosed from making contact with the defendant on another matter. * * * The essential point is whether the defendant desires to have counsel on the present charge or whether he will voluntarily waive that right.
>
> This decision is one that necessarily relates to the defendant's state of mind in regard to the present charge and we cannot conclude that an earlier decision to have counsel on an unrelated charge can be automatically assumed on the subsequent charge. Moreover, the State is still required before interrogation to give the defendant his *Miranda* warnings so that he may at this point make the decision to have counsel on the separate charge. To hold that his prior decision to have counsel on an unrelated charge forecloses further inquiry with the defendant on the new charge would result in an absolute presumption against waiver from a prior collateral occurrence.

*Clawson*, 270 S.E.2d at 669 (citations omitted).

The Fifth Circuit addressed similar facts in *United States v. Tyler*, 592 F.2d 261 (5th Cir.1979). There, defendant was in custody upon indictment for bank robbery. While in custody, defendant was required to participate without counsel in a police station lineup in another unrelated bank robbery investigation. Defendant argued that his sixth amendment right to counsel had attached because he was in custody at the time of the lineup. The court, however, held:

> The fact defendant was in custody for an unrelated offense at the time of the lineup has no bearing on the issue here. The identification was not used in the other proceeding. Only as to that charge had defendant's right to counsel matured. Since the Government had not "committed itself to prosecute" defendant for this offense at the time of the lineup, his Sixth Amendment claim is without merit.

*Id.* at 263; *see also People v. Agee*, 100 Ill.App.3d 878, 881–82, 56 Ill.Dec. 164, 167, 427 N.E.2d 244, 247 (1981) (right to counsel at pre-indictment lineup does not arise merely because defendant was in custody and was represented by counsel on an unrelated criminal matter); *Turner v. State*, 614 S.W.2d 144, 147 (Tex.Crim.App.1981) (fact that defendant faced adversarial proceedings for attempted indecency with a child is not relevant to determination of defendant's right to counsel at a show-up for an unrelated aggravated rape offense).

Similarly, the Second Circuit in *United States v. Masullo*, 489 F.2d 217 (2d Cir. 1973), considered whether federal agents, before questioning defendant on federal drug charges, were required to notify the attorney who represented defendant on unrelated state charges. The court noted that there was no showing that defendant's attorney had been retained to represent defendant in the federal matter and that there was no proof that the crimes were related. Although defendant sought the exclusion of admissions made by him to federal agents, the court concluded that since no federal judicial proceedings had begun against defendant, he had no sixth amendment right to counsel at the time he made the admissions. *Id.* at 222. The court further commented:

> The concept that professional criminals have "house counsel" because of prior escapades and that therefore Govern-

ment agents knowing the identity of prior counsel have an obligation of constitutional or even ethical dimension to contact counsel before questioning them, is hardly appealing. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) requires that all who are arrested be advised of their right to obtain counsel and to remain silent. This, in our view, adequately protects their rights. Those who have no "regular" counsel and no means to retain counsel would seem to be more deserving of our solicitude.

*Id.* at 223–24; *see also Government of Canal Zone v. Sierra,* 594 F.2d 60 (5th Cir.1979) (fact that defendant was being represented by public defender's office on another charge did not preclude him from waiving his right to confer with counsel on the instant charge without notice to that counsel); *People v. Mack,* 152 Cal.Rptr. 882, 89 Cal.App.3d 974 (1979); *Jackson v. State,* 268 Ind. 360, 375 N.E.2d 223 (1978).

On the other hand, the New York Court of Appeals has adopted the rule urged by defendant in the present case. Under New York case law, once an interrogating officer knows or should know that a suspect is represented by counsel, even if only on an unrelated charge, statements obtained from the interrogation must be suppressed unless that attorney has been notified and given the opportunity to be present. *See People v. Bartolomeo,* 53 N.Y.2d 225, 229, 440 N.Y.S.2d 894, 896, 423 N.E.2d 371, 373 (1981). Thus, in *People v. Smith,* 54 N.Y.2d 954, 445 N.Y.S.2d 145, 429 N.E.2d 823 (1981), where an officer who questioned defendant about his involvement in a murder case knew that defendant had been arrested 8 months earlier on an unrelated sodomy charge, the court held the officer was obligated to inquire whether defendant was represented by an attorney on the sodomy charge and presumably to cease interrogation if he was so represented.

■ While the New York approach recognizes the importance of the lawyer in safeguarding the suspect's privilege against self-incrimination, that approach turns on the fortuity that a suspect has been charged on an unrelated offense before interrogation takes place. We choose to follow the majority of jurisdictions that hold that sixth amendment right to counsel does not automatically attach when an accused is questioned in an investigatory stage, notwithstanding he is represented by counsel on unrelated matters. By rejecting the "per se" rule of inadmissibility in these circumstances, we do not diminish our disapproval of custodial and non-custodial interrogations of accused represented by counsel who is not present. *See, e.g., Giddings v. State,* 290 N.W.2d 595 (Minn. 1980); *State v. Fossen,* 312 Minn. 414, 255 N.W.2d 357 (1977). Moreover, we deem it significant that the Dakota County Edwards case was unconnected with defendant's Hennepin County offenses. Different jurisdictions, and hence different police officers, were investigating these offenses. No information obtained by police investigating the Edwards case was used against defendant in any of the three Hennepin County trials.[5]

■ Defendant likewise contends that all statements made by him to the police violated his fifth amendment right against self-incrimination. Statements stemming from a custodial interrogation of an accused are inadmissible unless the state demonstrates that the accused has been fully and effectively apprised of his rights and has knowingly, intelligently and voluntarily waived those rights. *Miranda v. Arizona,* 384 U.S. 436, 475, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694 (1966). When waiver is claimed, this court will make an independent determination, on the basis of the facts as found, whether the state has shown that the waiver was knowing, intelligent and voluntary. In doing so we employ the totality of the circumstances approach. *State v. Linder,* 268 N.W.2d 734, 735 (Minn.1978).

**5.** At one point defendant's Hennepin County public defender told defendant that defendant would have to get a different attorney to represent him on the Dakota County charges.

■ As to statements made by defendant to the police prior to May 12, 1981, his contention is clearly meritless. On each occasion he was read his *Miranda* rights before being questioned. Defendant himself testified that on those occasions he understood his rights, spoke to the officers voluntarily, and wanted to talk with them without a lawyer being present.

■ However, defendant claims that his May 12, 1981 confession to Sonenstahl should be suppressed because he involuntarily waived his *Miranda* rights and was induced to confess by the "deal" offered by Sonenstahl. A determination of whether defendant's waiver and subsequent confession were voluntary turns on whether defendant was subjectively induced to confess or whether his confession was the product of freewill decision. *State v. Orscanin*, 283 N.W.2d 897, 899 (Minn.1979), *cert. denied*, 444 U.S. 970, 100 S.Ct. 464, 62 L.Ed.2d 385 (1979).

■ Here, the record reveals that defendant initiated all contact with Sonenstahl during April and May 1981. Sonenstahl did not question defendant about the Edwards case until the defendant himself volunteered information. Defendant asked Sonenstahl whether he could get medical treatment in exchange for his confession. Sonenstahl stated several times to defendant, both on and off tape, that neither he nor the Dakota County authorities could make any such promises. Defendant claims Sonenstahl promised him treatment and the dropping of the Hennepin County charges on which defendant had already been convicted. These conflicting contentions created a credibility issue for the trial court as trier of fact to resolve. The court found a knowing, intelligent and voluntary waiver. Therefore, we assume it chose to believe the police officer, a choice, in our view, clearly supported by the circumstances.[6] For a defendant to persuade a court that his confession was induced by a promise of leniency, there must be a stronger

showing of specific inducements than those made here. *Orscanin*, 283 N.W.2d at 900.

We conclude that defendant's statements made to police officials were made after being fully advised of his rights, that he understood those rights and that he voluntarily waived them.

2. The state called Tomi Willems to testify concerning her encounter with an older model brown station wagon just minutes before the abduction of Diane Edwards. Ms. Willems' description of this station wagon very closely resembled the description of the vehicle given by the five witnesses who had witnessed the abduction. Even when denying his responsibility for Ms. Edwards' death and his possession of a station wagon, defendant admitted in his early statements to the police that he had bumped an older model Chevrolet—yellow, white or gray in color—at Thompson Avenue to get the woman driver's attention on the evening of September 26, 1980. Ms. Willems' car, in fact, was a 1969 light yellow Nova. Thus, Ms. Willems' testimony links defendant to a brown station wagon similar to the one into which Ms. Edwards was forced just blocks from where the Willems incident occurred.

The day *after* Ms. Willems testified, the state's attorney notified defense counsel that Ms. Willems had been hypnotized by a psychologist in early October 1980 at the request of local police and the FBI to assist Ms. Willems in recalling precise details about the man and vehicle involved in this incident. Defense counsel immediately moved for a mistrial on the basis that Ms. Willems' testimony was inadmissible as hypnotically-induced testimony. After an extended omnibus hearing during which the trial judge viewed the videotapes of the hypnotic sessions conducted on October 1 and 2, 1980, the trial judge found no material differences between Ms. Willems' statements given before and after hypnosis and concluded that Ms. Willems' testimony was not hypnotically induced. The trial

---

**6.** We note that it is highly improbable that a Hennepin County detective could promise the dropping of three Hennepin County charges of which the defendant, after three separate trials, had been convicted.

judge also noted that in light of defendant's admissions, Ms. Willems' testimony "was not incriminating in the extreme." The trial judge denied the motion for mistrial but ordered that defense counsel have an opportunity to further cross-examine Ms. Willems if he so chose.

Defendant now contends that his constitutional right to a fair trial has been violated by admission of Ms. Willems' testimony and urges this court to adopt a per se rule precluding a previously hypnotized witness from testifying to any facts relating to the subject matter of the pretrial hypnotic interview.

We first considered use of hypnosis in criminal cases in *State v. Mack*, 292 N.W.2d 764 (Minn.1980). The victim in *Mack* had been brutally stabbed but could remember nothing of the attack upon her. Six weeks after the assault, at the suggestion of a police officer, she submitted to hypnosis by a self-taught lay hypnotist in the presence of two police officers. The issue before this court was the admissibility at trial of the victim's hypnotically-induced testimony. After carefully reviewing the testimony of five experts and the literature on the reliability of hypnotically-induced testimony, we there stated: "Regardless of whether such evidence is offered by the defense or by the prosecution, a witness whose memory has been 'revived' under hypnosis ordinarily must not be permitted to testify in a criminal proceeding to matters which he or she 'remembered' under hypnosis." *Mack*, 292 N.W.2d at 771. We went on to observe that we did not foreclose the use of hypnosis as an extremely useful investigative tool when a witness is enabled to remember verifiable factual information which provides new leads to the solution of a crime, but even then we warned that adequate safeguards should be established to assure the utmost freedom from suggestion upon the hypnotized person's memory recall in the event the witness must later be called to testify to recollections recorded prior to the hypnotic interview. *Mack*, 292 N.W.2d at 771.

We next addressed the issue in *State v. Koehler*, 312 N.W.2d 108 (Minn.1981). The crucial issue there was whether the defendant's car was at or near the scene of the crime at the time of its commission. Family members testified the car at the crucial time was in front of the defendant's residence. A witness claimed to have seen the victim riding in the passenger seat of an off-green, mid-1960's compact car, but he could give no more specific description. After being hypnotized by a police sergeant, the witness testified he had seen the defendant's car near the scene of the crime at the crucial time and remembered one number on the license plate. This was the only direct evidence linking the defendant to the area of the crime. Because the witness' hypnotically-influenced testimony was incriminatory and highly prejudicial, we reversed the defendant's conviction and mandated on retrial that the witness could not testify to matters adduced at the pretrial hypnotic interview except as such matters were previously and unequivocally disclosed by him to the police prior to the hypnosis. *Koehler*, 312 N.W.2d at 110.

In *State v. Blanchard*, 315 N.W.2d 427 (Minn.1982), we adhered to our holding in *Mack* and *Koehler* that a hypnotically-influenced witness must not be allowed to testify in a criminal proceeding concerning matters he or she "remembers" under hypnosis. *Blanchard*, 315 N.W.2d at 430. We there went on to hold, however, that admission of the witness' hypnotically-influenced recollections was not reversible error since it was not highly prejudicial and because six other witnesses testified as to the defendant's admission of guilt. Moreover, we noted that the witness' pre-hypnotic memory contained devastating evidence against the defendant and that in the post-hypnotic testimony the crucial information remained unchanged. *Blanchard*, 315 N.W.2d at 431.

These cases demonstrate that this court has consistently adhered to the rule of general inadmissibility of hypnotically-induced testimony in criminal cases. Investigators and prosecutors have been put on notice that the use of such testimony invites re-

versal. It will be a rare case when a conviction will be sustained if hypnotically-influenced testimony is used at trial.

Is this such a rare case? Although we entertain some doubt, we think it is.[7] The hypnosis safeguards to be exercised to minimize the possibility of suggestibility advanced by Dr. Martin S. Orne in *Mack* were scrupulously observed in the present case.[8] Moreover, Ms. Willems' post-hypnotic testimony was strikingly similar to her pre-hypnotic memory. In her September statements to officers—a day or two after the abduction—she described the vehicle as "an older brown wagon, (no wood grain sides)" and with "the left head light * * * out." She also described it as "dirty" and "beat-up." She described the driver as "mid-20's, glasses, medium brown shoulder length hair, medium build." After seeing a composite drawing of a suspect in a newspaper, she positively advised police that it showed the same person who attempted to get into her vehicle on that Friday evening.

At trial, post-hypnosis, Ms. Willems described the vehicle as an older model dark brown station wagon in rusty condition with the left headlight out. She described the driver as a male in his mid-20's with medium brown hair below ear length and hair growing on his upper lip but not a full moustache. At no point did she positively identify defendant as the driver.

 It appears clear that the differences between her pre-hypnotic testimony and her post-hypnotic testimony were slight to non-existent. In neither instance did she positively identify defendant as the driver of the car involved in her incident, and in both instances she was vague in her description of his appearance. Additionally, there were five other eyewitnesses to the abduction who gave descriptions of the vehicle used and vague descriptions of the abductor. Consequently, we conclude under these circumstances admission of her trial testimony was not prejudicial.

Finally, defendant contends the prosecutor violated Minn.R.Crim.P. 9.01, subd. 1(1)(a), subd. 1(4) and subd. 1(6)[9] by failing to disclose to defense counsel that Ms. Wil-

---

7. Other courts, even those which had adopted a per se rule of inadmissibility of hypnotically-induced testimony, have permitted the admission of pre-hypnotic testimony in limited instances. *See State ex rel. Collins v. Superior Court,* 132 Ariz. 180, 644 P.2d 1266 (1982); *People v. Jackson,* 114 Mich.App. 649, 319 N.W.2d 613 (1982); *State v. Patterson,* 213 Neb. 686, 331 N.W.2d 500 (1983); *People v. Hughes,* 59 N.Y.2d 523, 466 N.Y.S.2d 255, 453 N.E.2d 484 (1983); *Commonwealth v. Taylor,* 294 Pa.Super. 171, 439 A.2d 805 (1982). These courts have held that a witness is not rendered incompetent merely because the witness was hypnotized during the investigatory phase of the case; rather, the witness is permitted to testify concerning matters which the witness was able to recall and relate prior to hypnosis provided there is sufficient evidence to satisfy the court that the evidence was known and related prior to hypnosis. *See, e.g., State v. Patterson,* 213 Neb. 686, 331 N.W.2d 500 (1983); *State v. Hutchinson,* 99 N.M. 616, 661 P.2d 1315 (1983). As one court noted, if it were to hold otherwise, "the police will seldom dare to use hypnosis as an investigatory tool because they will thereby risk making the witness incompetent if it is later determined that the testimony of that witness is essential." *Collins,* 132 Ariz. at 209, 644 P.2d at 1295.

8. In *Mack* we noted, but did not adopt, those safeguards. *State v. Mack,* 292 N.W.2d 764, 771

n. 14 (Minn.1980). We do not adopt them in this case.

9. Minn.R.Crim.P. 9.01, subd. 1(1)(a), subd. 1(4) and subd. 1(6) so far as applicable read as follows:

> **Subd. 1. Disclosure by Prosecution Without Order of Court.** * * *
> (1) *Trial Witnesses; Grand Jury Witnesses.*
> (a) The prosecuting attorney * * * shall permit defense counsel to inspect and reproduce such witnesses' relevant written or recorded statements and any written summaries within his knowledge of the substance of relevant oral statements made by such witnesses to prosecution agents.
>
> * * * * * *
>
> (4) *Reports of Examinations and Tests.* The prosecuting attorney shall disclose and permit defense counsel to inspect and reproduce any results or reports of physical or mental examinations, scientific tests, experiments or comparisons made in connection with the particular case.
>
> * * * * * *
>
> (6) *Exculpatory Information.* The prosecuting attorney shall disclose to defense counsel any material or information within his possession and control that tends to negate or reduce the guilt of the accused as to the offense charged.

lems had been hypnotized until after she had testified at the trial. We agree that the prosecutor violated the letter and spirit of those rules and censure him for so doing but conclude the violation, under the circumstances existing in this case, does not warrant the granting of a new trial.

 Under the Minnesota Rules of Criminal Procedure, the prosecutor clearly had the obligation to disclose the fact of Ms. Willems' hypnosis. However, in this case the prosecutor was unaware that Ms. Willems had been hypnotized until 5 days before she testified. During the course of the lengthy pretrial proceeding, the defense counsel had access to the prosecutor's files. The prosecutor either overlooked the fact of hypnosis or took it upon himself to make the judgment that Ms. Willems' post-hypnotic testimony did not differ from her prior statements. If it were the former, lack of diligence in conforming to the criminal rules is apparent; if it were the latter, the prosecutor was clearly wrong—that determination was for the court. If defendant were prejudiced by his failure to disclose, a new trial would be mandated. We find, however, no prejudice. The entire hypnotic session was videotaped. Defendant and his counsel had the opportunity to and did view the videotapes of Ms. Willems' hypnotic session. The court offered defense counsel further opportunity to cross-examine the witness, an opportunity of which he chose not to take advantage.[10] Because Ms. Willems' post-hypnotic testimony was not prejudicial, we find no reversible error.

3. Defendant next asserts the trial court erred in admitting evidence of other crimes committed by him. The offenses consisted of the attempted kidnapping of and attempted sexual assault upon J.M. on October 27, 1980; the kidnapping of and sexual assault upon C.S. on October 25, 1980; and the kidnapping of and sexual assault upon L.W. on October 19, 1980.

Defendant had been convicted of each of these offenses in Hennepin County prior to this trial. The evidence was admitted to show identification, intent, common plan or scheme and motive. *State v. Saucedo,* 294 Minn. 289, 291–92, 200 N.W.2d 37, 39 (1972); *see also* Minn.R.Evid. 404(b).

 Admission of evidence of other crimes rests in the sound discretion of the trial court and will be upheld absent a clear showing of abuse of discretion. *State v. Johnson,* 256 N.W.2d 280, 286 (Minn.1977); *State v. Williams,* 307 Minn. 191, 194–95, 239 N.W.2d 222, 225 (1976). The prior offenses were acts of criminal sexual conduct and kidnapping strikingly similar to those with which defendant was charged in the Edwards case and closely related in time to the abduction of Ms. Edwards. *State v. Williams,* 325 N.W.2d 812 (Minn.1982); *State v. Morrison,* 310 N.W.2d 135 (Minn. 1981). Moreover, evidence of defendant's prior offenses was relevant to identity which he placed in issue by denying his confession and presenting an alibi. *State v. Billstrom,* 276 Minn. 174, 177–78, 149 N.W.2d 281, 284 (1967). There was no abuse of trial court discretion.

 4. Defendant alleges trial court errors which, though admittedly not requiring a new trial when considered in isolation, prejudiced him in their cumulative effect. *See State v. Underwood,* 281 N.W.2d 337, 344 (Minn.1979). Most of these alleged errors concerned the trial judge's rulings regarding physical evidence and testimony. These rulings involved the scope of cross-examination and relevancy of evidence, both determinations resting within the sound discretion of the trial court.

 We have reviewed the record and the context in which the rulings on the evidence were made. We find nothing to indicate the trial judge clearly abused his discretion by rulings made. The only issue raised deserving comment relates to the

---

**10.** As noted herein, Ms. Willems' post-hypnotic testimony did not differ in any material degree from that initially given to authorities. We note, however, effective cross-examination of a

previously hypnotized witness is virtually impossible. *See, e.g., State v. Mack,* 292 N.W.2d 764, 769 & n. 10 (Minn.1980).

trial court allowing transcripts of defendant's recorded statements to be read by jurors as they listened to the taped recordings. We hold the trial court did not abuse its discretion in finding proper foundation had been laid for the tapes or the transcripts. Moreover, the transcripts were collected from the jury immediately after the tapes were played and did not go to the jury room. Finally, the court gave the jurors a complete instruction as to the limited use of the transcript and admonished them that if the transcript differed from what they heard on the tape, they should follow the tape. *See United States v. McMillan,* 508 F.2d 101, 105 (8th Cir.1974), *cert. denied,* 421 U.S. 916, 95 S.Ct. 1577, 43 L.Ed.2d 782 (1975); *State v. Olkon,* 299 N.W.2d 89, 103 (Minn.1980), *cert. denied,* 449 U.S. 1132, 101 S.Ct. 954, 67 L.Ed.2d 119 (1981).

██ 5. Defendant's contention that the evidence is insufficient as a matter of law to sustain the convictions is clearly without merit. Defendant's own statements to police establish his guilt. A great quantity of other evidence existed to corroborate those statements. There were eyewitnesses to the abduction. Several witnesses linked defendant to possession of a brown station wagon similar to the one seen at the scene of the abduction. Without police prompting, defendant himself led police to the site of the disposition of Diane Edwards' body. Moreover, the defendant's at-trial alibi was inconsistent with the testimony of the other witnesses. Viewing the record in its entirety, there is more than sufficient evidence, if believed by the jury as, in fact, it was, to sustain the verdict that defendant was guilty of the kidnapping, criminal sexual conduct in the first degree, and the murder of Diane Edwards.

6. Finally, defendant urges reversal of his convictions because of misconduct of the prosecutor in his final argument. In the argument the prosecutor commented on the credibility of several of the state's witnesses by characterizing various witnesses as being "honest," "a woman of integrity," "honest detectives," and "hon-

est police officers." He extolled the police officers as "not the kind of officers who are going to get up here, take the stand, take the oath and tell you something if it isn't true." In addition, he characterized defendant's testimony as "[i]ncredible is the word for it * * *. I suggest to you that Mr. Ture is not only wrong, but not exactly telling the truth on the stand." Defendant's testimony was referred to as "a lot of nonsense" and as a "joke, joke." He depicted defendant as a "rapist and murderer" and as a "predator."

██ Both those portions of the final argument of the prosecutor endorsing the credibility of the state's witnesses and injecting personal opinion as to defendant's credibility were clearly improper. The credibility of a witness is to be determined by the jury. An advocate may indeed point to circumstances which cast doubt on a witness' veracity or which corroborates his or her testimony, but he may not throw onto the scales of credibility the weight of his own personal opinion. Such conduct is expressly prohibited by the Minnesota Code of Professional Responsibility, DR 7–106(C)(4), and the ABA Standards for Criminal Justice, § 3–5.8(b) (2nd ed. 1980).

██ While those parts of the prosecutor's final argument were clearly improper, we must consider whether they were so egregious as to justify a new trial. Normally, a determination of whether the prosecutor acted improperly in final argument is a matter within the discretion of the trial court. *State v. Fossen,* 282 N.W.2d 496, 503 (Minn.1979). At the trial defendant and his counsel failed to object to the improper statements and failed to seek specific cautionary instructions. Ordinarily, by failing to take either step the defendant is deemed to have forfeited his right to have the issue considered on appeal. *State v. Gunn,* 299 N.W.2d 137, 138 (Minn.1980); *State v. Flom,* 285 N.W.2d 476, 477–78 (Minn.1979). The fact that defendant failed to object to the prosecutor's statements suggests he then did not consider them prejudicial. *State v. Thomas,* 305 Minn. 513, 517, 232 N.W.2d 766, 769 (1975).

This court has held in cases where the prosecutor has expressed a personal opinion of the accused's guilt or the veracity of witnesses that such statements were harmless where the trial judge cautioned the jury that it should consider only the evidence and that counsel's final argument statements were not evidence, where the evidence of guilt was adequate, and where the prosecutor's argument was otherwise proper. *State v. Spaulding,* 296 N.W.2d 870, 876 (Minn.1980); *State v. Schultz,* 262 N.W.2d 411 (Minn.1978); *State v. Prettyman,* 293 Minn. 493, 495, 198 N.W.2d 156, 158 (1972).

In the present case the trial court gave an appropriate instruction to the jury that statements of counsel were not evidence and that its verdict could be based only on the evidence. In addition, the written jury instructions went into the jury room. Both the prosecutor and defense counsel informed the jury that it should only consider the evidence offered in the trial. Defense counsel in his final arguments stressed that arguments of counsel were not evidence. Moreover, the objectionable comments were isolated in an argument that took several hours after a lenghty trial.[11] Finally, as indicated, there was more than adequate evidence of defendant's guilt without these comments. Although we strongly disapprove of the prosecutor's comments, we cannot on this record conclude the jury based its verdict, even in part, on the improper statements of the prosecutor.

7. Defendant was convicted of one count of first-degree premeditated murder, Minn.Stat. § 609.185(1) (1982), one count of first-degree murder committed during a sexual assault, Minn.Stat. § 609.185(2) (1982), one count of criminal sexual conduct, and two counts of kidnapping. De-

fendant was only sentenced for the conviction of first-degree murder committed during a sexual assault. Defendant contends and the state agrees that the judgment of conviction of first-degree premeditated murder and one judgment of conviction for kidnapping should be vacated.

Minn.Stat. § 609.04 (1982) bars the conviction of a defendant twice for the same offense against the same victim on the basis of the same act. *State v. Discher,* 295 N.W.2d 99, 100 (Minn.1980); *see also State v. Bowser,* 307 N.W.2d 778, 779 (Minn.1981); *State v. Smith,* 299 N.W.2d 504, 506 (Minn.1980). Thus, defendant cannot legally be convicted of two counts of first-degree murder where both convictions were for the same offense on the basis of the same act involving the same victim. Likewise, defendant cannot legally be convicted of two counts of kidnapping. Accordingly, we vacate the judgment of conviction for first-degree premeditated murder and one judgment of conviction for kidnapping.

8. As a result of his three Hennepin County convictions, defendant was sentenced to three consecutive terms of imprisonment. In this case, the trial judge imposed the mandatory life sentence, Minn. Stat. § 609.185 (1982), to run consecutively to the last of the previously-imposed sentences. Relying on Minn.Stat. § 609.035 (1982), the single sentence statute, defendant claims his murder conviction should run concurrently with his prior sentences. That reliance is misplaced. The statute's basic purpose is to "leaven the harshness which may result from multiple prosecutions arising out of a single criminal episode." *State ex rel. Stangvik v. Tahash,* 281 Minn. 353, 361, 161 N.W.2d 667, 672 (1968). Defendant's life sentence was imposed for a crime arising out of a criminal

---

11. *See* Vess, *Walking a Tightrope: A Survey of Limitations on the Prosecutor's Closing Argument,* 64 J.Crim.L. and Criminology 22 (1973). The author points out this is a factor to be considered:

 Fourth, the court may take into account the length of the trial or the length of the argument. It may be that a misstatement in a

short trial is not serious error, since the jurors should have an independent recollection of the evidence. On the other hand, a lengthy argument after a long trial is more likely to be imperfect, and minor transgressions in this setting may also be excused.

 *Id.* at 55.

518

incident separate from the incidents for which he was previously sentenced in Hennepin County. The trial court's determination that the consecutive sentence was necessary to protect the public is supported by our prior cases. *State v. Olson*, 291 N.W.2d 203 (Minn.1980); *Bangert v. State*, 282 N.W.2d 540, 547 (Minn.1979).

We affirm the defendant's convictions for first-degree murder committed during a sexual assault, criminal sexual conduct in the first degree, and for one charge of kidnapping. We vacate defendant's judgment of conviction for first-degree premeditated murder and for one charge of kidnapping. We affirm the trial court's sentence on the first-degree murder charge to be served consecutive to the sentences affirmed in *Ture v. State*, 353 N.W.2d 518 (Minn.1984), filed herewith.

Affirmed in part and vacated in part.