*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-0003**

State of Minnesota,
Respondent,

vs.

Cartrell Ismail Smith,
Appellant.

**Filed January 25, 2016
Affirmed
Larkin, Judge**

Hennepin County District Court
File No. 27-CR-13-32807

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Michael O. Freeman, Hennepin County Attorney, Jean Burdorf, Assistant County Attorney, Minneapolis, Minnesota (for respondent)

Julie Loftus Nelson, Nelson Criminal Defense & Appeals, PLLC, Minneapolis, Minnesota (for appellant)

        Considered and decided by Bjorkman, Presiding Judge; Ross, Judge; and Larkin, Judge.

UNPUBLISHED OPINION

**LARKIN**, Judge

Appellant challenges his convictions of aiding and abetting attempted second-degree murder, and aiding and abetting second-degree assault, arguing that the district court erred by allowing the state to introduce its theory regarding the motive for the crimes, that the prosecutor committed misconduct, and that the district court erred by admitting a photo lineup into evidence. We affirm.

## FACTS

Respondent State of Minnesota charged appellant Cartrell Ismail Smith with aiding and abetting attempted second-degree murder, aiding and abetting second-degree assault, and attempted first-degree aggravated robbery. The complaint alleged that in July 2013, Smith, Lorenzo Washington, and O.W., chased D.P. and shot him in the buttocks. The district court joined Smith's and Washington's cases for trial, and the cases were tried to a jury. The jury acquitted Smith and Washington of the aggravated-robbery charges but deadlocked on the other charges. Smith and Washington were retried on the charges of aiding and abetting attempted second-degree murder, and aiding and abetting second-degree assault.

At the second trial, D.P. testified that he was familiar with Smith and Washington "[t]hrough the streets" and knew them by their nicknames. D.P. knew Smith as "Pumo" and Washington as "Zomo." D.P. testified that one of Smith and Washington's associates, J.O., shot D.P. in the stomach in 2010 or 2011, when D.P. was 15 years old. J.O.'s nickname was "Skitz." D.P. never told the police that J.O. shot him because he did not

want to be called a snitch. J.O. was later shot and killed. D.P. testified that he knew Smith was acquainted with J.O. because Smith had told him so, and because he had seen Smith and J.O. together. D.P. had also seen Smith and Washington together. In addition, D.P. testified that he was in a treatment facility with Washington in 2012. D.P. testified that he did not get along with Washington because Washington called J.O. his brother and told people at the treatment facility that J.O. shot D.P.'s "balls off."

D.P. testified that on July 11, 2013, he was biking to a CVS store when "a whole bunch of kids riding around in circles on . . . bikes" confronted him and that he "knew it was trouble." D.P. testified that "a couple more kids came out [of] the alley" and one of them stopped him and asked what was in his pockets. Someone in the group said the name "Skitz." D.P. recognized Smith, Washington, and O.W. in the group. D.P. fled on his bicycle, and the group chased him. D.P. headed for a friend's house. When he was a block away, he heard gunshots and a "ting" sound on his bike. D.P. got off his bike and ran toward his friend's house. He knocked on the door and on a window, but his friend did not answer. D.P. started to leave but encountered Smith in the backyard; Smith was holding a gun. D.P. saw Washington in the front of the house. D.P. testified that he "[s]aw their faces" and "[t]ried to run." D.P. heard Washington say, "there he goes, there he goes," and Smith fired four shots. The last shot struck D.P.'s buttocks.

During closing argument, the state described D.P.'s "beef" with J.O. as a motive for the shooting. The prosecutor stated: "The beef with [J.O.] did not die when [J.O.] died. Like many rivalries, the issues between [J.O.] and [D.P.] didn't simply end, they were passed on to Mr. Washington and then passed on to Mr. Smith." The prosecutor argued

that it was clear that the people who chased and attacked D.P. were aligned with J.O. because one of them yelled the name "Skitz" during the attack. The jury found Smith and Washington guilty on all counts, and the district court sentenced Smith to serve 131 months in prison. Smith appeals.

**D E C I S I O N**

**I.**

Smith contends that the district court "committed reversible error when it allowed the state to introduce its theory of an alleged motive for the shooting when the state lacked a good faith basis for believing that its theory would be supported by witness testimony." Smith argues that the state "lacked good faith for introducing its theory that the shooting in this case was somehow linked to [J.O.'s] shooting of [D.P.] in 2010." Smith relies on *State v. Strommen*, which provides that "the state cannot be permitted to deprive a defendant of a fair trial by means of insinuations and innuendoes which plant in the minds of the jury a prejudicial belief in the existence of evidence which is otherwise inadmissible." 648 N.W.2d 681, 688 (Minn. 2002) (quotation omitted). Smith also relies on *State v. Nissalke*, which provides that it is "'improper for a prosecutor to refer to evidence in an opening statement without a good-faith basis for believing the evidence is admissible.'" 801 N.W.2d 82, 104 (Minn. 2011) (quoting *State v. Smallwood*, 594 N.W.2d 144, 150 (Minn. 1999)).

In his opening statement, the prosecutor told the jury that J.O. shot D.P. in 2010, that J.O. was later shot and killed, that Smith and Washington associated with J.O., and that someone in the group that chased and shot D.P. yelled the name "Skitz," which was

4

J.O.'s nickname. The record establishes that the state had a good-faith basis to believe that such evidence was admissible because the district court ruled that it was admissible before trial. Smith had moved to "exclude all references to [J.O.] during trial." The district court ruled that "[D.P.'s] personal beef with [J.O.] and the fact that somehow it was inherited by either of these defendants is admissible for motive if there's anybody to testify to it." The district court further ruled:

> [J.O.'s] beef with [D.P.] can come in. The whole thing about the argument between one of these codefendants and [D.P.] at [the treatment center] about who got what shot off can come in. The . . . argument and any evidence from which an inference can be drawn that this shooting was in retaliation for [J.O.] can come in.

Moreover, the state provided evidence at trial to back up its opening statement. D.P. testified that J.O. shot him in 2010 or 2011, that someone later shot and killed J.O., that Smith and Washington knew J.O., that Washington called J.O. his brother and mocked D.P. for getting shot by J.O., and that one member of the group that confronted D.P. announced the name "Skitz," which was J.O.'s nickname. That evidence supported the state's theory that Smith was motivated to aid D.P.'s shooting based on the conflict between D.P. and J.O.

Smith also contends that the prosecutor committed misconduct when "he deliberately used a leading question to elicit testimony about the alleged motive for the shooting." After D.P. testified that someone in the group said the name "Skitz" and he believed he was in trouble, the prosecutor asked, "Did you believe that this may have related to your past history with [J.O.] and Mr. Washington?" D.P. replied, "Yes." The

district court sustained an objection to the question as leading and ordered that the answer be stricken. The district court later instructed the jury to "disregard all evidence I have ordered stricken."

Smith relies on *State v. White*, which explains that:

> It is unprofessional conduct for either the prosecutor or defense counsel knowingly and *for the purpose of bringing inadmissible matter to the attention of the judge or jury* to offer inadmissible evidence, ask legally objectionable questions, or make other impermissible comments or arguments in the presence of the judge or jury. Similarly, it is unprofessional conduct to ask a question which implies a factual predicate which the examiner cannot support by evidence.

295 Minn. 217, 223, 203 N.W.2d 852, 857 (1973) (emphasis added) (citations omitted). Smith also relies on *State v. Henderson*, which provides that "[i]t is improper for a prosecutor to ask questions that are calculated to elicit or insinuate an inadmissible and highly prejudicial answer." 620 N.W.2d 688, 702 (Minn. 2001). When reviewing objected-to alleged prosecutorial misconduct, an appellate court utilizes a harmless-error test. *State v. Carridine*, 812 N.W.2d 130, 146 (Minn. 2012).

Lay-witness testimony "in the form of opinion or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Minn. R. Evid. 701. "A lay witness's opinion or inference testimony may help the jury by illustrating the witness's perception in a way that the mere recitation of objective observations cannot." *State v. Pak*, 787 N.W.2d 623, 629 (Minn. App. 2010); *see also Abar v. Ramsey Motor Serv., Inc.*, 195 Minn. 597, 599, 263 N.W. 917, 918 (1935)

("Words may fail to convey to the jury the actual situation as the witness saw it, but by expressing his opinion or conclusion as to the cause of the situation the jury may be able to comprehend what he saw."). "Motive is not an element of most crimes, but the state is usually entitled to prove motive because motive explains the reason for an act and can be important to a required state of mind." *State v. Ness*, 707 N.W.2d 676, 687 (Minn. 2006) (quotation omitted).

D.P.'s opinion regarding why he was in danger was admissible to establish motive. Moreover, the factual predicate implied by the prosecutor's leading question was supported by D.P.'s testimony about his history with J.O. and Washington. In sum, the prosecutor did not engage in unprofessional conduct under *White* or *Henderson*.

## II.

Smith next contends that his convictions must be reversed "because . . . multiple instances of prosecutorial misconduct denied him . . . his right to a fair trial."

> The prosecutor is an officer of the court charged with the affirmative obligation to achieve justice and fair adjudication, not merely convictions. Generally, a prosecutor's acts may constitute misconduct if they have the effect of materially undermining the fairness of a trial. Also, misconduct results from violations of clear or established standards of conduct, e.g., rules, laws, orders by a district court, or clear commands in this state's case law. Further, [the supreme court has] held that attempting to elicit or actually eliciting clearly inadmissible evidence may constitute misconduct.

*State v. Fields*, 730 N.W.2d 777, 782 (Minn. 2007) (citations omitted).

Smith once again assigns error to the prosecutor's use of leading questions. He argues that the prosecutor committed misconduct "throughout the trial when he

7

continuously posed leading questions that were designed to elicit key testimony in support of the state's theory of the case."

> Leading questions should not be used on the direct examination of a witness except as may be necessary to develop the witness testimony. Ordinarily leading questions should be permitted on cross-examination. When a party calls a hostile witness, an adverse party, or a witness identified with an adverse party, interrogation may be by leading questions.

Minn. R. Evid. 611(c).

As support for his prosecutorial-misconduct claim, Smith identifies 15 leading questions in the nearly 600-page trial transcript. The defense objected to each question, and the district court sustained the objections. But Smith does not establish that the prosecutor's use of leading questions violated clear or established standards of conduct, that the prosecutor attempted to elicit clearly inadmissible evidence, or that the prosecutor's questions had the effect of materially undermining the fairness of the trial. *See Fields*, 730 N.W.2d at 782. In sum, Smith has not established that the prosecutor's use of leading questions constitutes misconduct.

Smith also argues that the prosecutor committed misconduct during his opening and closing statements "by repeatedly instructing the jury that its duty was 'to find the truth.'" The prosecutor told the jury, during his opening statement, closing argument, and rebuttal, that it should "listen to the testimony, weigh it with reason and common sense, and find the truth in the case"; that the jurors were "the finders of fact, and [their] goal is to find the truth in the evidence"; and that the jury's "job is to find the truth." Smith did not object to any of these comments when they were made.

8

A defendant who fails to object to alleged prosecutorial misconduct ordinarily forfeits the right to appellate review of the purported misconduct. *State v. Ture*, 353 N.W.2d 502, 516 (Minn. 1984). This court has discretion to review unobjected-to prosecutorial misconduct if plain error is shown. Minn. R. Crim. P. 31.02; *State v. Ramey*, 721 N.W.2d 294, 297-99 (Minn. 2006). A plain-error claim based on prosecutorial misconduct has three requirements: (1) the prosecutor's unobjected-to act must constitute error, (2) the error must be plain, and (3) the error must affect the defendant's substantial rights. *Ramey*, 721 N.W.2d at 302. The burden rests with the defendant to demonstrate error that is plain. *Id.* "An error is plain if it was clear or obvious," which is usually shown "if the error contravenes case law, a rule, or a standard of conduct." *Id.* (quotation omitted). If the defendant satisfies his burden, the burden shifts to the state to demonstrate that the error did not affect the defendant's substantial rights. *Id.* "The third prong, requiring that the error affect substantial rights, is satisfied if the error was prejudicial and affected the outcome of the case." *State v. Griller*, 583 N.W.2d 736, 741 (Minn. 1998). "If these three prongs are satisfied, [appellate courts] then assess[] whether the error should be addressed to ensure fairness and the integrity of the judicial proceedings." *Ramey*, 721 N.W.2d at 302.

In *State v. Bailey*, the supreme court considered a challenge to a closing argument in which the prosecutor urged the jurors, "as the truth seekers, search for the truth in the evidence; don't search for doubt in the evidence, because you are the truth seekers. Search for the truth in the evidence, but give the defendant the benefit of any reasonable doubt." 677 N.W.2d 380, 403 (Minn. 2004). The *Bailey* court concluded that the prosecutor's statements did not amount to prosecutorial misconduct because although the statements

were "somewhat confusing, [they] were not a clear misstatement of the burden of proof and, in such event, would be superseded by the court's jury instructions on burden of proof." *Id.* Because caselaw has allowed similar comments during a prosecutor's closing argument, Smith has not demonstrated error that is plain, and he therefore is not entitled to relief under the plain-error standard of review.

**III.**

Lastly, Smith contends that the district court erred "when it permitted the state to introduce evidence of [his] photo lineup when it was unnecessary to prove identity and unfairly prejudicial." Prior to trial, Smith moved the district court, under Minn. R. Evid. 403, to exclude photo lineups that included "mug shots depicting Mr. Smith and Mr. Washington in jail attire within six-packs of other young men in jail attire." The district court denied the motion, stating:

> The photo lineups were litigated prior to trial the last time. I don't anticipate the evidence would be any different. And those were admissible at the last trial and will be at this trial. Identification is not really an issue because the defendants were known to the victim in this case, so there's not much prejudice there.

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. . . ." Minn. R. Evid. 403. Unfair prejudice has been defined as "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *State v. Bott*, 310 Minn. 331, 338 n.3, 246 N.W.2d 48, 53 n.3 (1976). "[T]he main reason for generally excluding police photographs is that the jurors might infer from them

10

that the defendant has been involved in prior criminal conduct." *State v. McAdoo*, 330 N.W.2d 104, 107 (Minn. 1983). "[I]n determining whether to admit such photographs, [the district court] must decide whether their probative value is substantially outweighed by the potential of the photographs for unfair prejudice." *Id*. "Evidentiary rulings rest within the sound discretion of the [district] court and will not be reversed absent a clear abuse of discretion." *State v. Amos*, 658 N.W.2d 201, 203 (Minn. 2003).

At trial, a photo lineup containing Smith's photo was admitted during the testimony of a police investigator. The investigator testified that he showed D.P. the lineup because D.P. had only provided nicknames to identify his assailants and the investigator wanted D.P. "to confirm that these were the people that we were talking about." Smith argues that the photo-lineup evidence was unnecessary and lacked probative value because D.P. knew Smith and identified him prior to viewing the lineup. Smith further argues that "showing the jury a mug shot of [him] in jail garb, grouped with other young, black males in jail garb, unduly prejudiced the jury into concluding, without any other evidence, that [he] was a criminal."

For the reasons that follow, we hold that the probative value of the photo-lineup evidence in this case is not substantially outweighed by the potential for unfair prejudice. D.P. initially identified Smith by a nickname. The photo lineup verified that D.P. had actually identified Smith. Moreover, D.P. had previously recanted his identification of Smith as the shooter at O.W.'s trial, testifying that Smith did not shoot him. The photo-lineup identification enhanced D.P.'s credibility and tended to corroborate his testimony at Smith's trial that Smith had shot him. *See State v. Axford*, 417 N.W.2d 88, 93 (Minn. 1987)

11

("Absent some rule of exclusion or some tendency of the evidence to produce an overbalancing amount of unfair prejudice, corroborating evidence is admissible."). Under the circumstances, the district court did not abuse its discretion by admitting the photo-lineup evidence.

**Affirmed.**