**STATE of Minnesota, Respondent,**

v.

**James D. DUPAY, Appellant.**

**No. C1–86–1350.**

Court of Appeals of Minnesota.

May 12, 1987.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Robert M.A. Johnson, Anoka Co. Atty., Marcy S. Crain, Asst. Co. Atty., Anoka, for respondent.

C. Paul Jones, State Public Defender, Renee Bergeron, Asst. Public Defender, Minneapolis, for appellant.

Considered and decided by PARKER, P.J., and SEDGWICK and LANSING, JJ., with oral argument waived.

## OPINION

PARKER, Judge.

James Dean Dupay, a suspended Columbia Heights police officer, appeals his convictions for third-degree criminal sexual conduct and false imprisonment. We affirm.

## FACTS

Appellant James Dean Dupay, 29, had been a Columbia Heights police officer for five years at the time he was suspended in connection with this case. Previously, he had been a Hennepin County deputy sheriff for 16 months. On October 23, 1985, criminal charges were filed against him based on two separate incidents involving juvenile females, one occurring in 1985 and one in 1984. During the jury trial on the 1985 incident, two 1983 incidents and the 1984 incident were used as *Spreigl* evidence.

The 1985 incident, subject of the jury trial, involved 17–year–old S.N., a beauty contestant from a small Minnesota commu-

nity who was in the Twin Cities for a few days on pageant business, staying at the suburban home of a pageant official. On the evening of July 8, 1985, S.N.'s host dropped her off at a pool party with some young people he wanted her to meet.

Around midnight, the young people drove to Silver Lake Beach to go swimming, although the beach was closed for the evening. They entered the beach area by stepping over a cable strung between posts. As they got in the water, Dupay and another policeman arrived and told them the beach was closed and they were trespassing. Those who were of age were issued tickets and allowed to go home. Dupay drove three under-age females, including S.N., to the Columbia Heights police station to call their parents to come and get them. Richard, the boy who had driven S.N. to the beach, followed them to the police station at S.N.'s request and waited in the parking lot while the girls were taken into the station.

Once inside, the other two girls called their parents and were picked up. S.N. told these girls that she had called her host, and she remained at the station after the other girls had left. Dupay went out to Richard's car twice in the next two hours, telling him he could go, but he remained. Finally, S.N. went out, accompanied by Dupay, and told Richard he could go—that her host was coming to get her. At about 3:00 a.m., Richard left.

S.N.'s host was never notified and was waiting up for S.N. when she arrived at 5:30 a.m., her hair wet and disheveled. She didn't want to talk and said only that she had been arrested for trespassing and that an officer had brought her home after his shift. She then went to bed.

The next day S.N. told Richard that she hadn't called anyone; that Dupay had told her he would "lose her paperwork" and drive her home after his shift at 3:30; that on the way home the officer asked her if she wanted to go swimming and she refused; that Dupay drove to the Silver Lake Beach anyway; and that she did not get home until 5:30 a.m. She gave no further details.

About a month later, S.N. told a friend that Dupay had had intercourse with her at the beach. Shortly after that, Richard reported what S.N. had told him to his attorney, who alerted the Columbia Heights Police Department. An investigation was begun, in the course of which S.N.'s parents were contacted. S.N. then told her parents about the events of July 8.

During the investigation it was discovered that, although Dupay's activity sheet indicated that he transported three females from the beach, no reference was made to S.N. Dupay was suspended and the Major Crime Investigation Unit (MCIU) took over the case. On September 25, 1985, S.N. gave the investigators a detailed statement.

On October 23, 1985, James Dupay was charged with six counts involving two minor females. The first four counts alleged offenses against S.N. committed on July 9, 1985: Count I, third-degree criminal sexual conduct; Count II, fourth-degree criminal sexual conduct; Count III, false imprisonment; and Count IV, misconduct of public officer involving a juvenile female. The last two counts alleged offenses against T.V., a 15–year–old female, committed on June 20, 1984: Count V, false imprisonment; and Count VI, misconduct by a public officer involving a juvenile female.

At an omnibus hearing the parties stipulated to severing Counts I–IV from Counts V and VI, and two separate trials were ordered.

On March 5, 1986, a jury trial commenced on Counts I–IV, involving S.N. She testified to the following events of July 9: that Dupay told her he knew of a beauty contestant who had lost her crown over something like trespassing; offered to give her a break by driving her home after his shift; told her to tell the girls and Richard that her host had been notified; hid her in the weapons closet for a few minutes so that other officers wouldn't see her; and took her to the lower level locker room, closed to the public, to wait for a few minutes while he changed clothes. She testified that he then drove her in a small blue economy car to Silver Lake Beach,

where they entered through a two-foot hole in a chain link fence; took off his gun belt and "flipped" it around in front of her for a couple of minutes before putting it in the trunk; insisted that she go swimming; asked if she minded if he went skinny-dipping, as he had no suit with him; insisted that she also go swimming in the nude; and then fondled and had sexual intercourse with her.

She further testified that he then drove her to her host's home, pulling off the road several times, whining and saying he hoped she wouldn't tell anyone what had happened and that he had to know if he still had a job in the morning; and that he dropped her off between 5:00 and 6:00 a.m. She testified that she hadn't wanted to tell her parents because they were still recovering from a recent tragedy; that she finally told her friend only after she began having headaches and hives; and that she told her parents only after they had been contacted by authorities investigating Dupay.

The MCIU investigator checked out S.N.'s descriptions of the weapons closet and the Silver Lake Beach entrance she said Dupay took her through and found they were accurate.

Dupay testified that S.N. told him she was a beauty contestant staying with a pageant official whom she didn't want to call; that he insisted that she call an adult to pick her up; that she then told him she had called her host; and that he (Dupay) decided to give her a break and not charge her. He also testified that it was S.N. who wanted Richard to leave; that he gave S.N. a tour of the station, including the weapons room, but not including the lower level; that S.N. was picked up by a person unknown to him, a white male in his mid–20's in a mid-sized car; that after she left he finished his paperwork and went home; and that his wife was awake when he got home at about 4:00 a.m. His wife corroborated his arrival time.

Admitted into evidence were three *Spreigl* incidents involving teenage girls—two from 1983 and one from 1984 (the subject of Counts V and VI). In chronological order, that evidence was as follows:

J.L., a 19–year–old female, testified that on May 24, 1983, a squad car followed her as she left a Columbia Heights Superamerica station, pulled alongside her, and then dropped behind again, following her for about ten blocks. She made an in-court identification of Dupay as the officer in that car. She testified that an hour later a policeman called her at home inquiring about her involvement in a hit-and-run accident and asking her to bring her car to the Columbia Heights Police Station. She told him she hadn't been in an accident. When he called back again requesting that she come to the station, she told him she would not come to the station without her father, and no more was heard.

When J.L. told her mother about this incident, her mother called the Columbia Heights Police Station, precipitating an investigation. Although Dupay had made no log entry or hit-and-run report, it was learned that he had run a license check on J.L.'s car. When questioned, Dupay said that an elderly man had given him the license number, claiming to have hit J.L.'s car. Chief of Police Stuart Anderson issued Dupay a letter cautioning him to make records of public contacts.

The next *Spreigl* incident occurred less than two months later. D.L., an 18–year–old female, testified that on July 14, 1983, Dupay, in plain clothes and driving an unmarked car, pulled her over for a traffic violation, kept her in his car for 45 minutes, complimented her on her tan, asked her to ride along with him on his beat, and asked her about details of her work schedule. She testified that he repeatedly talked about giving her a ticket, but said he couldn't find his ticket book and asked her what he should do about it. She testified that she was scared; thought he was impersonating a police officer; did not feel free to leave; and when he let her go she was hysterical and cried all the way home.

The next day, D.L.'s father called the Columbia Heights Police Department to report a man impersonating a police officer, and an investigation was initiated. Again, Dupay's log contained no record of such a stop. However, when Dupay saw the re-

port describing himself and his car, he volunteered that he had made the stop. He said he had stopped D.L. for 20 or 25 minutes and admitted that they had talked about a range of subjects, but denied asking her what to do about the ticket. This time Police Chief Anderson testified that he gave Dupay an oral warning about his failure to record his car stops and to be very careful in dealing with young females to avoid any question of improper conduct.

The following summer the third *Spreigl* incident (and subject of Counts V and VI) occurred. T.V., a 15–year–old female, testified that on June 20, 1984, Dupay stopped her and a friend for a traffic violation at midnight; that, after sending the friend home, Dupay drove her to the boat launch at Silver Lake Beach; that he asked her to go out with him, to kiss him, to give him mouth-to-mouth resuscitation, and to meet him there the next night at 11:00; that she asked him to take her home two or three times and did not feel free to leave; and that when he finally took her home at 2:30 a.m. she was scared and crying.

The next day, T.V.'s mother notified the Columbia Heights Police Department. Again, Dupay's log showed no record of this incident. However, when questioned by the police sergeant who took the report, Dupay admitted that he confined T.V. in his squad car for about one hour without making any log entry or police report. He admitted that he took her to Silver Lake Beach and that he asked her to meet him there again, but denied asking her to kiss him or give her mouth-to-mouth resuscitation. During the interview Dupay began to cry and said he was upset with himself. The sergeant issued him a letter of reprimand. In a subsequent letter Police Chief Anderson noted that this was a "repeat of a very similar incident which occurred in 1983." He ordered Dupay to record carefully every motor vehicle stop and prohibited Dupay from having female ride-alongs, other than his wife, and from having any female motorist in his car unless she was under arrest.

On March 15, 1986, the jury returned a verdict of guilty on Counts I–IV involving S.N. On March 24 Dupay waived a jury trial on Counts V and VI involving T.V. and stipulated to submit them to the court on the testimony and exhibits presented in the jury trial, plus additional stipulated exhibits. On March 27 the court found Dupay guilty of Counts V and VI.

On May 28, 1986, the court adjudicated the convictions for Count I, third-degree criminal sexual conduct, and Count V, false imprisonment. Dupay received stayed sentences of 23 months on Count I, and a year and a day on Count V on condition that he receive ten years' probation, a $5,000 fine plus surcharge, and one year in jail with Huber work release.

On appeal Dupay contends that (1) the trial court committed reversible error in allowing the introduction of the *Spreigl* evidence; (2) he was denied a fair trial when the prosecutor was allowed to comment on the timeliness of his alibi defense; (3) he was denied due process and a fair trial when the trial court limited his cross-examination of the sexual misconduct complainant; and (4) the evidence was insufficient to convict him.

## ISSUES

1. Did the trial court properly admit the *Spreigl* evidence?

2. Was Dupay deprived of his right to a fair trial in view of the prosecutor's statements regarding his alibi defense during closing argument?

3. Did the trial court properly limit defense counsel's cross-examination of the sexual misconduct victim?

4. Was the evidence sufficient to sustain the convictions?

## DISCUSSION

### I

Dupay contends the trial court erred in admitting evidence of the 1983 and 1984 incidents as showing a common scheme or plan. We disagree.

Evidence of other crimes or bad acts * * is admissible to prove the current accusation against a defendant when such evi-

dence tends to establish a common scheme or plan embracing the commission of similar crimes "so related to each other that proof of one or more of such tends to establish the [current] accusation." * * *

We will not reverse a trial court's admission of evidence of other crimes or bad acts unless an abuse of discretion is clearly shown. However, we have noted that in order for such evidence to be admissible the trial court must determine that there is "clear and convincing" evidence that the defendant participated in the crimes or bad acts sought to be admitted. The court must also determine that the evidence of prior crimes or bad acts is "relevant and material to the state's case." In addition, it must rule that the probative value of the evidence outweighs any potential for "unfair prejudice."

*State v. Doughman,* 384 N.W.2d 450 453–54, (Minn.1986); *see also* Minn. R.Evid. 404(b).

■ Applying these standards, we conclude that the trial court acted within the proper exercise of its discretion in admitting all three *Spreigl* incidents. The evidence of Dupay's participation in the May 1983 incident involving J.L. is clear and convincing, and the basic facts are undisputed. This incident is relevant to the State's case because it shows the germination of Dupay's common scheme or plan to use his position as a police officer to make undocumented contacts with teenage females for reasons that do not withstand scrutiny. We do not agree with Dupay's contention that this incident, or any of the others, is too remote in time. *See State v. Anderson,* 275 N.W.2d 554 (Minn.1978) (six-year-old *Spreigl* evidence admitted); *State v. McCoy,* 400 N.W.2d 807, 809–10 (Minn.Ct.App.1987), *pet. for rev. denied,* (Minn. Mar. 25, 1987) (ten-year-old *Spreigl* evidence admitted). Finally, it cannot be argued seriously that the probative value of this relatively slight misconduct is outweighed by any prejudicial effect.

The evidence of Dupay's participation in the July 1983 incident involving D.L. is also clear and convincing; again, the basic facts were undisputed. This incident is relevant to the State's case because of the many similarities to the S.N. incident: both involved extended detention of teenage girls for insignificant offenses, failure to make entries in the police log, and threats of harmful consequences but for the break Dupay was giving them in his position of authority. Again, the probative value of this evidence outweighs any prejudicial effect.

■ As to the 1984 incident involving 15–year–old T.V., Dupay admits the evidence is clear and convincing and relevant to the State's case. He contends only that, combined with the other two *Spreigl* incidents, it was unduly prejudicial. We disagree, finding that the prejudicial effect of this evidence is far outweighed by its value in proving Dupay's common scheme or plan to intimidate young females through misuse of his position as a police officer. As in the two previous incidents, Dupay used his position to make undocumented contact with a teenage female. As in the most recent incident, he detained her for a long period of time for an insignificant violation. However, he went further this time, foreshadowing the events in the S.N. incident by taking T.V. to Silver Lake Beach, asking her to kiss him and to meet him again the next night, and refusing to take her home until 2:30 a.m. In all three cases Dupay's misconduct was sufficient to cause responsible parents to alert the Columbia Heights Police Department.

We find no error in the admission of the evidence of these three incidents. This is, in fact, a good illustration of the proper use of *Spreigl* evidence. Together these incidents show more than a common scheme or plan; they show a progressive pattern of misconduct in which Dupay became bolder as he received virtually no punishment for his actions. Viewed in order, these incidents become increasingly serious, both in Dupay's misuse of his position and in his abuse of young females.

**II**

■ Dupay contends he was denied the right to a fair trial because of the prosecu-

tor's closing argument comments on his alibi that he was home with his wife. "The prosecutor may analyze the evidence and vigorously argue that defendant and his witnesses lack credibility." *State v. Johnson,* 359 N.W.2d 698, 702 (Minn.Ct.App. 1984) (citing *State v. Googins,* 255 N.W.2d 805, 806 (Minn.1977)). The prosecutor attacked the timeliness of the alibi defense, telling the jury that Dupay did not mention it when first questioned. We hold that this is a permissible attack on credibility.

### III

▮ Dupay contends he was denied due process and a fair trial when the trial court limited his cross-examination of S.N. Rulings involving the scope of cross-examination rest within the sound discretion of the trial court. *State v. Ture,* 353 N.W.2d 502, 515 (Minn.1984). The relevant portion of the cross-examination follows:

Q: And as I understand your previous testimony, what occurred during this intercourse was that Officer Dupay penetrated your vagina with his penis. I believe that was your testimony, is that correct?

A: Yes.

Q: How do you know it was his penis?

A: I'm sorry, I don't understand the question.

Q: How do you know that Officer Dupay penetrated your vagina with his penis?

A: Because I felt it.

Q: How do you know it wasn't his finger?

A: Because he had his hands around my waist.

Q: And so you assumed that it was his penis, is that correct?

MR. WEBER: Objection as to argumentative.

THE COURT: Objection is sustained.

MR. SINGER: You don't, in fact, know that it was his penis, do you?

MR. WEBER: Same objection, argumentative.

THE COURT: Objection is sustained.

We hold that the trial court was acting within the proper exercise of its discretion in limiting this line of cross-examination.

### IV

▮ Dupay contends the evidence was insufficient as a matter of law to convict him of any of the crimes against S.N. or T.V., claiming that their testimony is of dubious veracity and lacks sufficient corroborating evidence.

In reviewing a claim of sufficiency of the evidence we must determine whether, under the facts in the record and any legitimate inferences that can be drawn from them, a jury could reasonably conclude that the defendant was guilty of the offense charged. The evidence must be viewed in the light most favorable to the prosecution and it is necessary to assume that the jury believed the State's witnesses and disbelieved any contrary evidence.

*State v. Ulvinen,* 313 N.W.2d 425, 428 (Minn.1981) (citations omitted). Corroborating evidence is not necessary in a criminal sexual conduct prosecution. *State v. Williams,* 363 N.W.2d 911, 914 (Minn.Ct. App.1985), *pet. for rev. denied,* (Minn. May 1, 1985). We have carefully reviewed the evidence and conclude that the jury could reasonably conclude that Dupay was guilty of third degree criminal sexual misconduct and false imprisonment.

### DECISION

Affirmed.