STATE of Minnesota, Respondent,

v.

Charles Norman BELSSNER, Appellant.

No. C6–90–120.

Court of Appeals of Minnesota.

Dec. 18, 1990.

Review Denied Feb. 20, 1991.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Thomas L. Johnson, Hennepin Coun-

ty Atty., Linda K. Jenny, Asst. County Atty., Minneapolis, for respondent.

John M. Stuart, State Public Defender, Lawrence W. Pry, Asst. Public Defender, St. Paul, for appellant.

Considered and decided by FORSBERG, P.J., and RANDALL, and FLEMING, JJ.*

## OPINION

RANDALL, Judge.

Charles Norman Belssner appeals his conviction for aggravated forgery. He contends he was denied a fair trial where the court ruled on the admissibility of *Spreigl* evidence by adopting the order (allowing it in) of the trial court in a previous forgery prosecution in which he was also the defendant. Belssner also alleges that the evidence of other crimes was not relevant, and, if it was, he alleges prejudice from the evidence far outweighed its probative value. We affirm.

## FACTS

Appellant was having mortgage problems in the fall of 1987. Federated Financial Corporation (FFC), the mortgage holder, through its agent, Minnesota Foreclosure Service (MFS), initiated foreclosure procedures in August 1987.

A sheriff's sale had been scheduled for December 30, 1987. An attorney for appellant contacted the law firm of Kampmeyer & O'Connor, MFS' attorneys, inquiring as to the amount necessary to reinstate the mortgage. Appellant's attorney was informed that the mortgage could be reinstated for $17,257.30.

Friday, December 4, 1987, Mary Hauser, office manager for Kampmeyer & O'Connor, discovered a man back in the firm's secretarial area around 6:00 p.m.. The man identified himself as "Jim Keifer" from American Financial Printing. He claimed to be picking up a print request for one of the firm's attorneys named Krohnschnabel. No order could be found, and when Krohnschnabel's secretary was

called, she knew nothing about any print order. Mary Hauser was suspicious of "Jim". "Jim" left a phone number, and Mary Hauser indicated someone would get back to him about the print order.

Monday, December 7, 1987, Laura Bonne, a Kampmeyer & O'Connor secretary, discovered the "date received" stamp and David O'Connor's signature stamp out of place on her desk. Krohnschnabel's secretary tried to call "Jim," but the phone number he had left belonged to the Wall Street Journal. She also called American Financial Printing and learned that they had no employee named "Jim Keifer." Mary Hauser later identified appellant, at trial, as the man who called himself "Jim Keifer."

The sheriff's sale on appellant's home proceeded on December 30, 1987. After the sale had already started, appellant arrived and demanded the sale be halted. Appellant produced a letter purporting to be a receipt for $17,257.30. The letter was dated December 8, 1987, and written on Kampmeyer & O'Connor stationery. The letter was addressed to appellant and purported to bear the signature of David O'Connor. The letter stated:

> In Mr. Krohnschnabel [sic] absence, on behalf of Kampmeyer And [sic] O'Connor this will serve as a cash receipt in the amount of $17,257.30. In accordance with information provided you by Mr. Krohnschnabel this will bring you up to date on your mortgage requirements with Federated Financial Corporation.

MFS' representative, suspicious of the letter, tried to call O'Connor to verify the letter. Appellant left before O'Connor was reached. O'Connor denied having any knowledge of the letter, denied receiving any payment from appellant, and in fact, O'Connor was in Europe from November 20 to December 15, 1987.

In late November 1987, appellant had contacted Betty Knapp to sell his home. A purchaser was found and the closing was set for March 15, 1988. In the intervening time, Knapp had learned of the arrearages

---

\* Acting as judge of the Court of Appeals by appointment pursuant to Minn.Const. art. VI, § 2.

on appellant's mortgage, and she told him to bring $30,000 to the closing.

At the closing, appellant produced the same December 8, 1987, letter as evidence that he had satisfied the arrearages on the house. The closing agent was not satisfied with the December 8, 1987, letter, and she cancelled the closing.

On June 28, 1988, an attorney representing appellant contacted Krohnschnabel at Kampmeyer & O'Connor. Krohnschnabel was informed that appellant had filed a notice of Lis Pendens and was seeking to void the foreclosure sale. A copy of the December 8, 1987, letter was attached to the complaint.

A complaint charging appellant with one count of aggravated forgery (making or altering a writing) in violation of Minn.Stat. § 609.625, subd. 1(1) (1986) was filed in Hennepin County District Court on August 18, 1988. The State filed an amended complaint on January 3, 1989, in Hennepin County District Court charging appellant with a second count of aggravated forgery (uttering) in violation of Minn.Stat. § 609.625, subd. 3 (1986).

The appellant's defense at trial was that he had paid Kampmeyer & O'Connor in cash, and that the firm lacked adequate cash control procedures. Appellant claimed the firm was seeking to blame him rather than absorb the loss for mishandling his cash payment. Appellant claimed to have received the December 8, 1987, letter from someone at the firm named "Linda," and claims he had enough cash reserves to pay the arrearages at that time.

At trial, the state offered *Spreigl* evidence of four other alleged forgeries committed by appellant. The first *Spreigl* incident offered by the state was evidence from the "Lindstrom" case. The appellant had previously forged a Lindstrom Cleaning and Construction, Inc. billing statement to show payment of $4,066.55 in cash in January 1987. The forgery purportedly showed that payment was acknowledged by the the signature of a Mark Bielke. Bielke denied receiving any payment or signing such a statement, and a handwriting expert testified the signature was not Bielke's. Appellant was convicted of forgery on these facts at an earlier trial conducted before a Judge D.H.

The second *Spreigl* incident offered by the state showed appellant forged endorsements on two checks issued by State Farm Fire and Casualty Co.. The two checks were jointly payable to appellant and Federated Financial Corp.(FFC). The endorsement on both checks read:

> Transferred and payable to Charles Belssner due to overpayment and interest on mortgage at 8022 Sheridan. Federated Financial Corp. to pay insurance claim to Linstrom [sic] Construction and issue further refund of principal.

The checks also bore the signatures of appellant and Matthew Hyman.

Matthew Hyman testified that he neither typed the endorsement nor signed the checks over to appellant. Paula Bella, a FFC vice-president, testified FFC never received the checks, and that she and the company president are the only two persons authorized to endorse checks which neither did in this instance.

The third *Spreigl* incident involved the "Viking" case. Appellant owed a debt to Norwest Bank–Des Moines, and the debt had been turned over to Viking Collection Service in November 1986. On January 13, 1988, Viking's attorney, Paul Marso, obtained a default judgment against appellant.

Marso testified that appellant contacted him on January 29, 1988 claiming he had paid the debt in full. Marso received from appellant a copy of a Viking Collection Service "direct payment memo." The memo form had been filled in to show payment of $9,858.50 by appellant on January 29, 1987. The memo had been "date stamped" January 29, 1987, as well as stamped "paid" and "settled in full." Marso and Don Corll, Viking's vice-president, testified the memo was a forgery and testified the debt had never been paid.

The final *Spreigl* evidence involved a cash receipt which showed payment of $1,760.19 to the law firm of Levin, Roers, Quigley and Aspnes. Appellant had de-

faulted on a charge card, and a partner in the firm had obtained a default judgment. The cash receipt was purportedly in full settlement of the litigation. The firm denied the receipt was genuine, and they denied receiving any payment from appellant.

Prior to trial, appellant had twice requested an individual hearing on the admissibility of the state's *Spreigl* evidence. At a Rasmussen hearing on June 8, 1989, Judge P.F. ruled the same *Spreigl* evidence admissible in the present case as was allowed in by Judge D.H. in the previous case, the so-called "Lindstrom" case. The record does not show Judge P.F. independently reviewed the transcript of Judge D.H.'s order before making his ruling.

Immediately prior to the trial of the present case, on September 11, 1989, appellant renewed his request for an individual *Spreigl* hearing. The trial judge, now a Judge K.G., again listened to arguments of both counsel. However, this time, a transcript of Judge D.H.'s order was available for review. Judge K.G. also affirmed Judge D.H.'s previous order on the admissibility of the evidence, but, in so doing, he made an independent review.

Appellant denied all the *Spreigl* allegations. He claimed to have paid all of these debts in cash. Appellant produced witnesses to testify to his habit of paying bills in cash.

Prior to the testimony of most of the *Spreigl* witnesses, the trial court issued a cautionary instruction, consistent with 10 Minnesota Practice, CRIM. JIG 3.16, to the jury. However, the trial court did not give a cautionary instruction prior to the testimony of two of the witnesses. In the final charge, the court issued a cautionary instruction to the jury referring to *all* the *Spreigl* evidence, but left out the name of one of the *Spreigl* witnesses. The appellant made no objections to the cautionary instructions throughout the trial.

The jury began deliberations on September 26, 1989, and returned a verdict finding appellant guilty of a violation of Minn.Stat. § 609.625, subd. 1(1) forgery: making or altering a writing) and of a violation of Minn.Stat. § 609.625, subd. 3 (aggravated forgery: uttering).

## ISSUES

1. Did the trial court commit reversible error when it ruled *Spreigl* evidence admissible simply affirming an order from a prior forgery prosecution of appellant which found the same *Spreigl* evidence admissible in a prior independent prosecution of appellant?

2. Was the *Spreigl* evidence in the present case irrelevant as to any permissible purpose or use consistent with Minn.R. Evid. 404(b)?

3. Did the prejudicial effect of the *Spreigl* evidence, in the present case, outweigh its probative value?

4. Were the limiting instructions given by the trial court in regard to the *Spreigl* evidence inadequate?

## ANALYSIS

### I.

### *The Spreigl Hearing*

Appellant contends that the *Spreigl* procedures set out in *State v. Billstrom*, 276 Minn. 174, 149 N.W.2d 281 (1967) and its progeny were not complied with in his trial below, and therefore, he was denied a fair trial. Appellant first argues that the Rasmussen hearing judge committed reversible error by adopting the order of Judge D.H., from the "Lindstrom" trial, ruling the state's *Spreigl* evidence admissible. Appellant argues that since Judge P.F. did not consider the transcript of Judge D.H.'s earlier order it was not possible for him to find that, in the present case, the state's *Spreigl* evidence was: clear and convincing, relevant and material to the state's case, and that its probative value was not outweighed by any unfair prejudice. *See State v. Dupay*, 405 N.W.2d 444, 449 (Minn.App.1987) (citing *State v. Doughman*, 384 N.W.2d 450, 453–54 (Minn.1986)). Appellant's argument focuses only on the Rasmussen hearing.

If the Rasmussen hearing were the *only* time, prior to presentation of the evidence

to the jury, that the admissibility of the state's *Spreigl* evidence was considered, appellant's argument would be persuasive. Judge P.F. erred when he did not make an independent review of the State's *Spreigl* evidence.

■ Judge P.F. should have reviewed the transcript of Judge D.H.'s earlier ruling on the same evidence just as if the transcript were an offer of proof by the State. Judge P.F. should have then considered the State's offered *Spreigl* evidence *in the context of the present case.* He then should have made independent findings that proof of the *Spreigl* incidents would be clear and convincing, relevant and material to the present case, and that its probative value outweighed any unfair prejudice.

This independent review is necessary simply because in each felony charged against appellant, *the facts were different.* The offered *Spreigl* was the same, but that is not the point. The offered *Spreigl* evidence must *be relevant to the felony case at trial,* and here, each felony case was different. Appellant was entitled to an independent review by the trial judge every time he faced a new felony charge as to whether, under the particular facts then before the court, the offered *Spreigl* evidence fit the needed threshold for such evidence. The previous ruling on admissibility cannot be res judicata. Each of appellant's separate felony trials were charged out on completely different facts. *Spreigl* has to fit the case at trial, and that fit has to be determined by an independent review each time the facts of the underlying charge change. A determination that the same *Spreigl* evidence previously fit a different set of facts "might" be helpful but cannot be determinative.

■ However, Judge P.F.'s error was rendered harmless by subsequent proceedings in the case. Prior to jury selection on September 11, 1989, appellant renewed his request for a review of the admissibility of the state's *Spreigl* evidence. The trial judge, Judge K.G., heard appellant's motion and listened to arguments of both counsel. The transcript of this September 11, 1989 hearing indicates that Judge K.G. had access to more information than Judge P.F.

When appellant's trial counsel argued for re-opening the *Spreigl* issue, he told the court he had reviewed the transcript from Judge D.H.'s order in the "Lindstrom" case, and due to the transcripts complexity, he urged that the *Spreigl* evidence be reviewed in detail by the trial court to decide whether there should be any changes as to which *Spreigl* offenses should be admissible at trial. The prosecutor in turn informed Judge K.G. that the transcript of Judge D.H.'s order included his specific findings, and it was made clear to the trial court that a copy of the transcript was available for its review. The arguments of counsel also brought out for Judge K.G. what constituted the *Spreigl* evidence.

At the conclusion of arguments the following exchange took place:

THE COURT: I'd like to see both Counsel in chambers if I might. *Do you have a transcript of that other hearing?*

MR. REDDING: Yes.

THE COURT: Would you both come in my chambers, please.

(Off-the-record discussion in chambers between Court and Counsel.)

THE COURT: After considering the arguments of both Counsel and the authority cited, at this time I am * * * going to *affirm the decisions of the Trial Court on the Lindstrom matter with regard to the Spreigl matters arising from the case.*

I'm going to affirm Judge [D.H.'s] rulings in this matter which also, as a matter of fact, would affirm Judge [P.F.'s].

(emphasis added).

In light of Judge K.G.'s being urged to review the "Lindstrom" transcript by appellant's trial counsel; his specific request for the transcript prior to issuing his ruling; and his ruling specifically affirming the *decisions* of the "Lindstrom" court (and only as an aside, affirming Judge P.F.), appellant cannot now argue the trial court acted blindly on the *Spreigl* question in this latest case. It seems clear Judge

K.G. independently reviewed the "Lindstrom" transcript containing the earlier order by Judge D.H.

A trial court has the responsibility of determining the admissibility of *Spreigl* evidence, and in doing so must determine that the other offenses offered as evidence are proven by clear and convincing evidence, that the offenses are relevant and material to the state's case, and that the probative value outweighs the potential for unfair prejudice. *Dupay*, 405 N.W.2d at 449.

In both Judge K.G.'s present case and the "Lindstrom" case, the only available evidence for the state was circumstantial evidence. The issues and defenses which the jury would consider were the same, and the state's *Spreigl* evidence would be the same offenses. Therefore, within the context of the facts of this case now pending, it was not an abuse of discretion for Judge K.G. to affirm Judge D.H.'s decisions on the *Spreigl* evidence as he made enough of an independent review.

A review of the "Lindstrom" transcript shows that Judge K.G. affirmed the finding that the forged endorsements on the State Farm checks were proven by clear and convincing evidence, were relevant and material to the issues and defenses in the case, and that their probative value was not outweighed by the possibility of unfair prejudice. Judge K.G. affirmed the finding that the forged direct payment memo of the "Viking" case was proven by clear and convincing evidence, was relevant and material to the issues in the case, showing common plan and scheme, intent, and absence of mistake, and that the probative value was not outweighed by the possibility of unfair prejudice. Judge K.G. also affirmed the finding that the forged cash receipt regarding the charge card litigation was relevant and material to show identity, modus operandi, common plan and scheme, intent, absence of mistake and preparation, was proven by clear and convincing evidence, and its probative value was not outweighed by the possibility of unfair prejudice.

Judge K.G. made his affirmation (which amounted to a ruling of admissibility for

use of the *Spreigl* evidence in the present case) of Judge D.H.'s order *within the context of the present case* then pending before him. Therefore, Judge K.G. did make the necessary findings of clear and convincing proof, relevance and materiality, and significant probative value.

Was it allowable for Judge K.G. to consider the earlier order and transcript of Judge D.H. in making his *Spreigl* ruling? "[T]he trial court has broad discretion in determining whether or not to require the state to call the *Spreigl* witnesses at the hearing to determine the admissibility of the *Spreigl* evidence." *State v. Kasper*, 409 N.W.2d 846, 847 (Minn.1987).

> [M]ost trial judges generally use the offer of proof procedure at the *Spreigl* hearing. [The Court sees] nothing wrong with this or any reason for requiring a mini-trial on the issue.

*Id.* At the September 11, 1989, hearing, the prosecutor described what the *Spreigl* offenses would show. The content of the prosecutor's statement would not have been appreciably different had it been labeled as an "offer of proof." Judge K.G. could have exercised his discretion and based his ruling on what the prosecutor said the evidence would show. Use of a verbatim transcript from a prior *Spreigl* hearing fairly approximates a trial court's use of an offer of proof on which to base a *Spreigl* ruling.

Appellant next argues that the *Spreigl* procedures were not complied with because the state failed to specify the particular exception to the general exclusionary rule for other crimes which would make the evidence admissible. *See Billstrom*, 276 Minn. at 176, 149 N.W.2d at 284. Appellant contends the state did not identify the particular exceptions at either the Rasmussen hearing or when the evidence was offered at trial. The notice provisions set out in *State v. Spreigl*, 272 Minn. 488, 497, 139 N.W.2d 167, 173 (1965) and *Billstrom*, 276 Minn. at 178, 149 N.W.2d at 284–85, are premised on the idea that a defendant should be protected from the surprise introduction of other crimes evidence and allowed time to prepare to

defend against that evidence. In this present case, there was no surprise.

At the June 8, 1989, Rasmussen hearing, appellant, having already received the state's written *Spreigl* notice, was again put on notice that the state wanted to use the same *Spreigl* evidence and for the same purposes as Judge D.H. had ruled admissible in the "Lindstrom" trial. Appellant knew what that evidence was, his counsel obtained a copy of the transcript of Judge D.H.'s findings and order, and appellant had three months to prepare to defend against that evidence. The goals of *Spreigl* and *Billstrom* were preserved.

Further, throughout the Rasmussen hearing, the September 11, 1989 pre-trial hearing, as well as while the *Spreigl* evidence was being introduced during the trial, the appellant was silent and never raised any objection as to the lack of specificity by the state as to under which exception the *Spreigl* evidence was being offered. The state had provided written notice of its intent to offer the *Spreigl* evidence, and consequently "the other *Spreigl–Billstrom* procedures became mandatory only upon the defendant's objection and/or request." *State v. Forsman,* 260 N.W.2d 160, 169 (Minn.1977). Since appellant raised no objections, nor made any requests inquiring under which exceptions the *Spreigl* evidence was being offered, the failure of the state to so specify is not reversible error. The record does not disclose prejudice to appellant. This is particularly so in the present case where the "Lindstrom" transcript indicated for what purposes the evidence would be admissible, and the evidence was presented at trial consistent with the representations made in the transcript.

## II.

*The Relevance and Materiality of the Spreigl Evidence*

■ Appellant next contends that the *Spreigl* evidence admitted during trial was not relevant for any purpose set out in Minn.R.Evid. 404(b). In order to be admissible, *Spreigl* evidence must be relevant to one of many purposes *other* than to show an accused acted in conformity with his character. Minn.R.Evid. 404(b).

The state has the burden of proving each and every element of an offense beyond a reasonable doubt. The intent to defraud is an essential element of both Minn.Stat. § 609.625, subd. 1(1) (making or altering) and Minn.Stat. § 609.625, subd. 3 (uttering).

The state had to prove that appellant not only forged and uttered the O'Connor letter, but it had to prove in each instance appellant did the acts with the intent to defraud. The "Lindstrom" billing statement forgery, the forged endorsements on the two State Farm claim checks, the forged "Viking" direct payment memo, and the forged cash receipt in the charge card litigation are relevant to the accused's intent when producing and using the O'Connor letter. In determining the relevance of *Spreigl* evidence, "there must be some similarity—either in time, location or *technique*—between the *Spreigl* offense and the offenses charged." *State v. Anderson,* 396 N.W.2d 566, 568 (Minn.1986) (emphasis added). Furthermore, the Court "has adopted a flexible approach in determining the relevancy of *Spreigl* evidence and will defer to the trial court's decision." *Id.*

In the present case, the similarities between the *Spreigl* evidence and the charged offenses are numerous and significant. In each *Spreigl* incident a document was forged by appellant either in its creation or by endorsement to reflect a liability having been satisfied by the payment of cash. In each instance, the evidence indicates that appellant used the forms of his creditors and either altered them by stamping "paid" or fraudulently endorsing them as having been paid or satisfied in full. These *Spreigl* incidents were done by appellant for the purpose of avoiding his legal liabilities.

The O'Connor letter was sufficiently similar in that Kampmeyer & O'Connor received no payment from appellant, the letter was produced when appellant's mortgage default was threatening his home, the letter was produced on Kampmeyer &

O'Connor stationery, O'Connor's signature was clearly forged since he was out of the country on December 8, 1987, and the very text of the forged letter purports to satisfy appellant's legal liability to Federated Financial Corp.. Where so many significant similarities exist between the *Spreigl* evidence and the charged offenses, the evidence is probative as bearing on the appellant's intent in forging the O'Connor letter. *See Anderson*, 396 N.W.2d at 568–699.

The *Spreigl* evidence was also relevant to showing the O'Connor letter was part of a common plan or scheme. Appellant argued that the *Spreigl* evidence was not shown to be preplanned steps in a larger scheme of which the alleged forgery of the O'Connor letter was another step. Appellant relies on *Forsman*, 260 N.W.2d 160, for this proposition. However, the case actually stands against appellant's argument. The pertinent paragraph on which appellant relies reads as follows:

> We have no difficulty in finding evidence of the * * * incident admissible under the "common scheme or plan" exception. This exception was originally reserved for those offenses which could be described as preplanned steps in a larger scheme of which the charged offense was another step. * * * *This exception has evolved to embrace evidence of offenses which, because of their marked similarity in modus operandi to the charged offense, tend to corroborate evidence of the latter.* * * *

*Forsman*, 260 N.W.2d at 167 (emphasis added) (citations omitted).

Appellant argued that there are substantial differences between all the offenses at issue. Appellant contends that because each of the forgeries purporting to relieve him of legal liabilities was on a different type of paper and because each of the creditors arose from a different transaction that there was no significant similarity between the offenses. The differences appellant points out are superficial. It is obvious each receipt would be on a different piece of paper. Each time the forger would find paper relevant to the specific liability he was trying to avoid. It is not necessary that a common plan or scheme have the same victim for each offense. *See, e.g., State v. Crocker*, 409 N.W.2d 840 (*Minn.1987*); *Dupay*, 405 N.W.2d 444.

The *Spreigl* evidence admitted at the trial below was relevant to the state's case. It was probative of at least intent and common plan or scheme. See Minn.R.Evid. 404(b).

### III.

#### *Probative Value vs. Unfair Prejudice*

Appellant next contends that the *Spreigl* evidence should have been excluded because its relevance was substantially outweighed by its prejudicial value. Appellant's only support for this position is his assertion that the *Spreigl* evidence was excessively voluminous. Volume is an argument but is not, without more, determinative. The test is to balance the state's need against the defendant's right to a fair trial. *State v. Halverson*, 381 N.W.2d 40, 43 (Minn.App.1986), *pet. for rev. denied* (Minn. Mar. 21, 1986).

The number of *Spreigl* offenses is not determinative of unfair prejudice. *See, e.g., Dupay*, 405 N.W.2d at 449 (three *Spreigl* offenses admitted without error to show a common plan or scheme). In the present case, the state's evidence was purely circumstantial and the *Spreigl* evidence was not only relevant to show appellant's intent to defraud and common plan and scheme, but the similarity of the modus operandi of the *Spreigl* offenses to that of the charged offense is relevant to establish appellant's identity as the maker of the O'Connor letter. *See, e.g., Halverson*, 381 N.W.2d at 43 (*Spreigl* evidence of common plan and scheme of defendant to harrass ex-wife was relevant to issue of identity of defendant as the source of threat to ex-wife's boy friend).

The trial court did not abuse its discretion in finding the *Spreigl* evidence relevant and its probative value outweighing unfair prejudice.

### IV.

#### *Spreigl Evidence Limiting Instructions*

Appellant lastly contends that the cautionary instructions given regarding the

*Spreigl* evidence, both during trial and in the final charge, were inadequate.

 Appellant's claim of error is untimely. No objections or requests for instructions were ever made by the appellant during the trial, and therefore, the objection is waived. *State v. Bellcourt,* 305 N.W.2d 340, 342 (Minn.1981); *State v. Berge,* 288 N.W.2d 687, 689 (Minn.1979); *Forsman,* 260 N.W.2d at 169. Also, it is clear the thrust of the trial court's charge to the jury on the limited use of *Spreigl* evidence was fair and should have conveyed to the jury the importance of limiting the use of *Spreigl* evidence.

## DECISION

Appellant was entitled to an independent review of the admissibility of the same *Spreigl* evidence each time it was offered in a new felony trial. Appellant received a fair review from Judge K.G. The *Spreigl* evidence was relevant and material, and its probative value was not outweighed by unfair prejudice. Any defects in the cautionary instructions regarding the *Spreigl* evidence were waived by appellant's failure to request instructions or object at trial to the instructions as given.

Affirmed.